J-A03032-24

2024 PA Super 68

| | | |
|---|---|---|
| LESLIE NIGON, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF THOMAS A. NIGON, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | |
| | : | No. 671 WDA 2023 |
| BRIAN F. JEWELL, M.D.; TRI-STATE ORTHOPAEDICS AND SPORTS MEDICINE, INC; UPMC PASSAVANT; UPMC; THOMAS J. MALVAR, M.D., INDIVIDUALLY AND AS GENERAL PARTNER/MEMBER OF THE MEDICAL PRACTICE GENERALLY KNOWN AS AND D/B/A MALVAR AND ASSOCIATES A/K/A MALVAR ASSOCIATES A/K/A DOCTOR MALVER AND ASSOCIATE; MARITONI MALVAR, M.D., INDIVIDUALLY AND AS A GENERAL PARTNER/MEMBER OF THE GENERALLY KNOWN AS AND D/B/A MALVAR AND ASSOCIATE A/K/A MALVAR ASSOCIATES A/K/A DOCTOR MALVAR AND ASSOCIATE; MALVAR & ASSOCIATES A/K/A DOCTOR MALVAR AND ASSOCIATE | : : : : : : : : : : : : : : : : : : | |

Appeal from the Order Entered June 7, 2023
In the Court of Common Pleas of Lawrence County
Civil Division at No. 2019-30009

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

OPINION BY MURRAY, J.:  **FILED: April 9, 2024**

Leslie Nigon, individually and as administratrix of the Estate of Thomas

A. Nigon, deceased (the estate), appeals from the entry of summary judgment

in favor of Thomas J. Malvar, M.D., individually and as a general partner of Malvar & Associates;[1] Maritoni Malvar, M.D., individually and as a general partner of Malvar & Associates; and Malvar & Associates (sometimes referred to as the practice) (collectively, the Malvar Defendants), which effectively dismissed all claims against the Malvar Defendants in this medical malpractice action.[2]  We reverse and remand.

The trial court explained:

> Thomas A. Nigon was first seen by Dr. Thomas J. Malvar[, his primary care physician,] relative to a blood clotting issue on or about September 13, 2017, at which time Dr. [Thomas] Malvar prescribed Eliquis, a blood thinner and anticoagulant.
>
> On January 25, 2018, Mr. Nigon underwent an ultrasound of his right [leg] which showed the prior [deep vein thrombosis (DVT)] had resolved with medication, and as a result, Dr. Malvar ordered a discontinuance of the Eliquis prescription.
>
> From January 25, 2018[,] until April 26, 2019, Mr. Nigon had no medical issues and sought no medical treatment.
>
> On April 26, 2019, Mr. Nigon, age 54, fell down the steps at his home and suffered a leg injury.  After the fall, Mr. Nigon presented himself to the emergency room at UPMC Jameson relative to complaints of the left leg injury and concerns about a DVT.  Mr. Nigon was told by the medical staff at UPMC Jameson that he did not have a DVT, and he was instructed to follow[ ]up with an orthopedic surgeon of his choice for his left leg injury.

---

[1] Malvar & Associates is also known as Malvar Associates and Dr. Malvar and Associates.

[2] This order was made final by the trial court's June 7, 2023, order approving a joint tort settlement with respect to the remaining named defendants. **Loftus v. Decker**, 289 A.3d 1093, 1097 (Pa. Super. 2023) ("A final order is any order that disposes of all claims and of all parties.") (citing Pa.R.A.P. 341(b)(1) (brackets omitted)).

Mr. Nigon scheduled an appointment with [] Brian F. Jewell, M.D., an orthopedic surgeon with [] Tri-State Orthopaedics & Sports Medicine, Inc. [(Tri-State)], for his left leg injury on May 1, 2019, at which time he was evaluated by [] Dr. Jewell, and his physician's assistant …, diagnosed with a high-grade tear of the left quadriceps, and was advised that he needed surgery.

At the May 1, 2019[,] office visit with [] Dr. Jewell, Mr. Nigon advised [] Dr. Jewell[] of his history of blood clots.

Mr. Nigon was instructed to seek standard pre-operative clearance from … Dr. Thomas Malvar. Mr. Nigon met with Dr. Thomas Malvar on May 6, 2019, at which time, despite [] Dr. Thomas Malvar being aware of Mr. Nigon's history of DVT, no mention was made of his need for thromboprophylactic medication, and there was no discussion with Mr. Nigon relative to his increased risk of deadly blood clots affiliated with the pending surgery. [] Dr. Thomas Malvar[] cleared Mr. Nigon for surgery, without mentioning the blood clotting issue.

On May 9, 2019, Mr. Nigon was admitted to UPMC Passavant Hospital, at which time he underwent a surgical left quadricep tendon repair, performed by Dr. Jewell. [] UPMC Passavant's chart from Mr. Nigon's surgery states that Mr. Nigon required "Xarelto post-opt"[3] [*sic*] which was also acknowledged by Dr. Jewell as part of the documentation at Tri-State….

After the surgery, Mrs. Nigon was provided with patient education per [Dr.] Jewell's request, which alleged[ly] excluded any reference to risk of clots and made no mention of thromboprophyla[xis].

Mr. Nigon was discharged from UPMC Passavant the same day as his surgery. The discharge was handled by [a registered nurse], at which time[, the estate] alleges [,Mr. Nigon] was without a prescription for any thromboprophylactic[] medication.

_____

[3] Xarelto is a prescription medication used, in part, to treat and reduce the risk of blood clots. **See** XARELTO, https://www.xarelto-us.com (last visited Feb. 1, 2024); **see also** Dr. Jewell's Brief in Support of Motion for Summary Judgment, 8/23/21, Exhibit D (Deposition of Dr. Jewell), at 63-64 (discussing the use of Xarelto as an anticoagulant in this case).

[The estate's] complaint alleges that Mr. Nigon's discharge instructions included the pack of information which [] Dr. Jewell[] told Mrs. Nigon would include "everything needed", but did not include a prescription for Xarelto, and made no reference to thromboprophyla[xis] or the risk of clots.

On May 14, 2019, Mr. Nigon was at home alone, recovering from the surgery. Mrs. Nigon was at work, where she received a call from her husband at approximately 9:00 a.m. informing her that her husband was in trouble. Mrs. Nigon rushed home and called an ambulance … Unfortunately, Mr. Nigon passed away from a massive bi-lateral pulmonary emboli[sm] cause[d] by [DVT] of his left lower extremity before the medical technicians could get Mr. Nigon to the local hospital.

Trial Court Opinion and Order, 11/3/21, at 7-9 (footnote added).

On August 28, 2019, the estate filed a complaint against the Malvar Defendants.[4] Concerning Dr. Thomas Malvar, the estate asserted causes of action in medical negligence (survival and wrongful death) and lack of informed consent (survival and wrongful death). Against Dr. Maritoni Malvar, a general partner of the practice,[5] the estate alleged survival and wrongful

---

[4] The complaint also named as defendants Dr. Jewell, Tri-State, UPMC Passavant, UPMC, and Enclave Cryotherapy, LLC. Enclave Cryotherapy, LLC, was removed from the action after the trial court sustained its preliminary objections in the nature of a demurrer. The remaining defendants are not parties to the instant appeal. For simplicity, we limit our recitation of the procedural history to the Malvar Defendants.

[5] Dr. Maritoni Malvar's status as a general partner in Malvar & Associates is not in dispute. *See* Plaintiff's Response in Opposition to Dr. Maritoni Malvar's Motion for Summary Judgment, 10/14/21, Exhibit A (Dr. Malvar's Responses to Plaintiff's First Request for Admission), Exhibit B (Partnership Agreement), Exhibit C (Deposition of Dr. Thomas Malvar). We further note that although the estate named Dr. Maritoni Malvar as a defendant both individually and in
*(Footnote Continued Next Page)*

death causes of action based on a theory of vicarious liability. As to Malvar & Associates, the estate asserted survival and wrongful death claims based on vicarious liability. Further, the estate asserted a claim for negligent infliction of emotional distress (NIED) against all named defendants. The estate sought both compensatory and punitive damages.

The Malvar Defendants filed preliminary objections in the nature of a demurrer.[6] Dr. Maritoni Malvar also filed an affidavit of non-involvement and a related motion to dismiss, arguing she had neither provided medical care to Mr. Nigon nor acted in a supervisory capacity to a treating physician.[7] In a

_____

her capacity as general partner, the causes of action in the complaint advance **only** a theory of vicarious liability.

[6] In part, Dr. Thomas Malvar argued he was not required to obtain Mr. Nigon's informed consent for pre-operative clearance, as it is not a "procedure" under Section 504 of the Medical Care Availability and Reduction of Error (MCARE) Act. Preliminary Objections, 8/13/19, ¶¶ 17-30 (citing 40 P.S. § 1303.504 (concerning informed consent)). The estate did not contest Dr. Thomas Malvar's preliminary objection to the informed consent counts. Response, 9/26/19, ¶¶ 17-30. In its March 5, 2020, order, the trial court sustained all uncontested preliminary objections. Order, 3/5/20, at 3.

[7] Section 506 of the MCARE Act provides:

> **(a) General provisions.--**Any health care provider named as a defendant in a medical professional liability action may cause the action against that provider to be dismissed upon the filing of an affidavit of noninvolvement with the court. The affidavit of noninvolvement shall set forth with particularity the facts which demonstrate that the provider was misidentified or otherwise not involved, individually or through its servant or employees, in the care and treatment of the claimant and was not obligated, either

*(Footnote Continued Next Page)*

March 5, 2020, order, the trial court overruled Dr. Maritoni Malvar's preliminary objections and denied her motion to dismiss, citing her potential vicarious liability as a general partner in the practice. The Malvar Defendants filed an answer and new matter.

On April 27, 2021, the estate filed a second amended complaint. As to its survival action against Dr. Thomas Malvar, the estate alleged:

> 100. The injuries and damages set forth above were caused by the negligent, careless, and reckless acts of [Dr.] Thomas Malvar, including, but not limited to, the following:
>
> a. Failing to adequately evaluate [Mr. Nigon's] condition and/or problem;
>
> b. Failing to recognize that [Mr. Nigon] was at an increased risk of DVT and PE;
>
> c. Failing to prophylactically recommend or prescribe any medication, treatment, therapy, devices, remedies, and/or any monitoring to prevent thrombosis;
>
> d. Unreasonably clearing [Mr. Nigon] for a surgery with a known risk of DVT and PE, while knowing [Mr. Nigon] had an increased risk of DVT and PE, without taking any precautionary measures;
>
> e. Failing to thoroughly review [Mr. Nigon's] medical history to appreciate his recent history of DVT and PE;
>
> f. Improperly discontinuing [Mr. Nigon's] usage of Eliquis;
>
> g. Failing to diagnose the cause of [Mr. Nigon's] original DVT and PE;

---

> individually or through its servants or employees, to provide for the care and treatment of the claimant.

40 P.S. § 1303.506(a).

h. Failing to take a proper, thorough, and accurate history relating to [Mr. Nigon];

i. Failing to review his own medical records which outline [Mr. Nigon's] recent history of DVT and PE;

j. Failing to properly prevent DVT and PE;

k. Failing to conduct a thorough examination of [Mr. Nigon] prior to clearing him for surgery; and

l. Failing to exercise reasonable care and diligence in the application of knowledge and skill to [Mr. Nigon].

101. [Dr. Thomas Malvar] undertook and assumed a duty to [Mr. Nigon] to render prompt, proper, adequate, and appropriate medical care. [Dr. Thomas Malvar] also undertook and assumed a duty to [Mr. Nigon] to take appropriate measures to improve his condition and to avoid harm, which was breached as referred to above.

102. [Dr.] Thomas Malvar's careless, negligent, and reckless breaches of the standard of care were the direct and proximate cause of [Mr. Nigon's] DVT, PE, and subsequent death.

Second Amended Complaint, 4/27/21, ¶¶ 100-02 (some capitalization modified). The estate incorporated the above allegations by reference in its wrongful death action against Dr. Thomas Malvar. *Id.*, ¶ 105. The Malvar Defendants filed an answer and new matter to the second amended complaint.

The parties engaged in extensive discovery, which included requests for admissions, depositions, and submission of expert reports. Relevant to this appeal, the estate submitted expert reports prepared by Eric Coris, M.D. (a family medicine expert), and John Ludgin, M.D., Esquire (an expert in root cause analysis). Dr. Coris explained that although Dr. Thomas Malvar ordered

some testing following Mr. Nigon's DVT in 2017, he did not order certain other "standard" tests. Estate's Motion for Summary Judgment on Comparative Fault, 8/24/21, Exhibit D (Expert Report by Dr. Coris), at 2. Dr. Coris indicated that discovery of Mr. Nigon's prothrombin gene mutation "would have warranted lifetime coagulation to protect from future blood clots." **Id.** at 3. Dr. Coris opined that Dr. Thomas Malvar deviated from the standard care in his treatment of Mr. Nigon's 2017 DVT and in relation to the 2019 surgical clearance visit. **See id.** at 3-4 (detailing specific failures to show deviation from the standard of care). Importantly, Dr. Coris opined that these deviations from the standard of care "directly caused Mr. Nigon's death." **Id.** at 5. Dr. Coris also stated that he rendered his opinions to a reasonable degree of medical certainty. **Id.**

Dr. Ludgin attributed "the multitude of system failures that led to [Mr.] Nigon's discharge … without anticoagulation therapy", causing him to die five days later, "to each of the defendants and the defendants as a whole." **Id.**, Exhibit B (Expert Report of Dr. Ludgin), at 11. Dr. Ludgin opined that Dr. Thomas Malvar deviated from the standard of care by failing to adequately communicate Mr. Nigon's history of DVT and emphasize the need for post-operative anticoagulation therapy. **Id.** at 10. Dr. Ludgin offered his opinions "to a reasonable degree of medical-administrative certainty…." **Id.** at 9.

On August 17, 2021, the Malvar Defendants, both individually and collectively, filed motions for summary judgment. Dr. Thomas Malvar sought

partial summary judgment on the issue of punitive damages. Dr. Thomas Malvar also filed a separate motion for summary judgment concerning the medical negligence claims. He argued there was no causal link between his conduct and Mr. Nigon's death, and that Dr. Jewell was aware of Mr. Nigon's need for anticoagulants following surgery. Dr. Thomas Malvar attached a portion of Dr. Jewell's deposition transcript:

> [Malvar Defendants' Counsel]: Okay. You testified earlier that you performed your own [history and physical (H&P)] on Mr. Nigon prior to the surgery, correct?
>
> [Dr. Jewell]: We performed an H&P and placed it on the UPMC chart, yes.
>
> Q: Okay. And you testified that you were aware of Mr. Nigon's history of clotting issues or DVTs prior to the surgery, correct?
>
> A: I agree.
>
> Q: And because you were aware of that, you prescribed him the Xarelto, correct, as a postoperative course?
>
> A: I agree.
>
> Q: So, isn't it true, then, that regardless of whether Dr. [Thomas] Malvar would have identified a DVT as a risk on that medical clearance form, you were already aware of that because you performed the H&P prior to the surgery?
>
> A: I do not think that the information on his note or lack thereof affected my care in any way directly.

Dr. Thomas Malvar's Brief in Support of Summary Judgment, 8/17/21, Exhibit E (Deposition of Dr. Jewell), at 113-14.[8]

Additionally, Dr. Maritoni Malvar filed a motion for summary judgment, citing her original affidavit of noninvolvement. The Malvar Defendants filed a motion for partial summary judgment as to the NIED claim and request for punitive damages. The estate filed responses.

The trial court heard argument on the motions for summary judgment and partial summary judgment in October 2021. On November 3, 2021, the trial court issued an order addressing all motions for summary judgment. Pertaining to the Malvar Defendants, the trial court 1) granted the Malvar Defendants' motion for partial summary judgment as to the NIED and punitive damage claims; 2) granted Dr. Thomas Malvar's and the Malvar Defendants' motions for summary judgment concerning medical negligence; and 3) granted Dr. Maritoni Malvar's motion for summary judgment based on her affidavit of noninvolvement and dismissed her as an individual defendant.[9]

---

[8] Dr. Thomas Malvar attached only a portion of Dr. Jewell's deposition to his brief in support of summary judgment. The complete transcript is attached to Dr. Jewell's brief in support of summary judgment as Exhibit D.

[9] The trial court noted its prior denial of Dr. Maritoni Malvar's motion to dismiss at the preliminary objections stage, pending discovery. In its order granting summary judgment, the trial court explained that discovery had been completed, and the estate did not depose Dr. Maritoni Malvar. Trial Court Opinion and Order, 11/3/21, at 31.

*See* Trial Court Opinion and Order, 11/3/21, at 38-39. In sum, the trial court dismissed all claims against the Malvar Defendants.

The estate filed timely a motion for reconsideration, arguing the trial court failed to mention the estate's expert reports or to consider all reports in a light most favorable to the estate. *See* Motion for Reconsideration, 11/16/21. The estate further averred it had established Dr. Maritoni Malvar's vicarious liability for Dr. Thomas Malvar's negligence by virtue of her general partner status. The trial court initially granted reconsideration and heard argument. After argument, the trial court denied reconsideration. *See* Order, 3/18/22.

After the remaining defendants reached a settlement,[10] which rendered the summary judgment order final, the estate timely appealed. Both the estate and the trial court have complied with Pa.R.A.P. 1925.

The estate raises two issues for review:

I. Did the trial court abuse its discretion or err as a matter of law in concluding at summary judgment that Dr. Thomas J. Malvar's negligent medical care was not a factual cause of Thomas A. Nigon's death?

II. Did the trial court err as a matter of law by holding that agency law does not apply to physicians who are general partners in a general partnership?

Estate's Brief at 8 (some capitalization modified).

---

[10] Dr. Jewell, Tri-State, and UPMC Passavant settled the wrongful death and survival claims. *See* Order Approving Joint Tort Settlement, 6/7/23.

- 11 -

Our standard of review is well-settled:

A trial court should grant summary judgment only in cases where the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The moving party has the burden to demonstrate the absence of any issue of material fact, and the trial court must evaluate all the facts and make reasonable inferences in a light most favorable to the non-moving party. The trial court is further required to resolve any doubts as to the existence of a genuine issue of material fact against the moving party and may grant summary judgment only where the right to such a judgment is clear and free from doubt. … [T]he summary judgment standard that a trial court must view the facts, and all reasonable inferences, in a light most favorable to the non-moving party clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. An appellate court may reverse a grant of summary judgment only if the trial court erred in its application of the law or abused its discretion.

***Bourgeois v. Snow Time, Inc.***, 242 A.3d 637, 649-50 (Pa. 2020) (internal citations and quotation marks omitted). "[T]he issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*." ***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1159 (Pa. 2010) (citation omitted); ***see also Wright v. Misty Mountain Farm, LLC***, 125 A.3d 814, 818 (Pa. Super. 2015) (stating "we apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact.").

In its first issue, the estate argues the trial court erred by concluding that Dr. Thomas Malvar's conduct was not a factual cause of Mr. Nigon's death.

- 12 -

Estate's Brief at 23. According to the estate, "[Dr. Thomas] Malvar does not get a pass simply because Dr. Jewell also failed Mr. Nigon." *Id.* at 25. The estate contends the trial court failed to review its expert reports in the light most favorable to the estate. *See id.* at 27-32. The estate claims the experts' opinions (*i.e.*, that Dr. Thomas Malvar's failures to provide thromboprophylaxis and to provide adequate patient education caused Mr. Nigon's death) are supported by the factual record. *See id.* at 32-37.

Additionally, the estate asserts that Dr. Thomas Malvar provided negligent care during the initial onset of Mr. Nigon's DVT in 2017. *Id.* at 37. The estate again points to Dr. Coris's expert opinion that Dr. Thomas Malvar negligently failed to evaluate Mr. Nigon for hereditary thrombophilia and prescribe a lifetime anticoagulant medication.[11] *See id.* at 38-41. The estate claims the trial court failed to consider its expert reports or this theory of liability. *Id.* at 41.

Further, the estate contends that in evaluating Dr. Thomas Malvar's summary judgment motion, the trial court ignored a critical fact: Dr. Thomas Malvar altered Mr. Nigon's medical chart in the early morning hours on the day after Mr. Nigon died. *Id.* at 41. According to the estate, the trial court usurped a jury function by declining to consider the post-mortem alteration of

_____

[11] The estate does not argue that a life-long prescription for anticoagulation medication would have prevented the post-operative embolism.

medical records. *Id.* at 43 (citing Pa. SSJI (Civil) § 14.40 (2020) (Alteration or Destruction of Medical Records)).[12]

The Malvar Defendants counter, "Dr. Jewell and his entire staff admitted full knowledge of Mr. Nigon's medical history and the need for anticoagulation." Appellees' Brief at 7. The Malvar Defendants claim Dr. Jewell's admissions severed any potential causal connection between Dr. Thomas Malvar's care and Mr. Nigon's death. *Id.* at 7, 9. Further, the Malvar Defendants assert the estate's expert opinions directly contradict the established facts. *Id.* at 11.

"Medical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient…." ***Toogood v. Owen J. Rogal, D.D.S., P.C.***, 824 A.2d 1140, 1145 (Pa. 2003). To establish a *prima facie* case of medical negligence, a plaintiff must demonstrate

> a duty owed by the physician, that the breach was the proximate cause of the harm suffered, and the damages were a direct result of harm. With all but the most self-evident medical malpractice actions[,] there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation.

***Vazquez v. CHS Prof'l Practice, P.C.***, 39 A.3d 395, 397-98 (Pa. Super. 2012) (citations and quotation marks omitted); ***see also Krishack v. Milton***

---

[12] The estate does not identify the alterations Dr. Thomas Malvar purportedly made to Mr. Nigon's medical chart.

*Hershey School*, 145 A.3d 762, 765 (Pa. Super. 2016) ("Even with proof of both breach of duty as prescribed under statute and the occurrence of injury, … plaintiffs are still obligated to show the two were linked by causation." (citation omitted)).[13]

"To show causation, the plaintiff must show that the defendant physician's failure to exercise the proper standard of care caused the plaintiff's injury." *Mazzie v. Lehigh Valley Hosp. – Muhlenberg*, 257 A.3d 80, 87 (Pa. Super. 2021) (citation, quotation marks, and brackets omitted). Generally, a plaintiff in a medical negligence action must present expert testimony to establish the physician's deviation from the standard of care "proximately caused the plaintiff's injury." *Grossman v. Barke*, 868 A.2d 561, 566-67 (Pa. Super. 2005) (citation omitted).

Further,

[a] plaintiff cannot survive summary judgment when mere speculation would be required for the jury to find in plaintiff's favor. A jury is not permitted to find that it was a defendant's negligence that caused the plaintiff's injury based solely upon speculation and conjecture; there must be evidence upon which logically its conclusion must be based. In fact, the trial court has a duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation. Additionally, a party is not entitled to an inference of fact that amounts merely to a guess or conjecture.

*Krishack*, 145 A.3d at 766 (citation omitted).

---

[13] The estate does not set forth the elements of a medical negligence cause of action in its brief. However, it is clear from the estate's argument that it challenges the causation requirement.

Instantly, the trial court determined the factual record provided no evidence supporting the estate's allegation of a causal connection between Dr. Thomas Malvar's conduct (*i.e.*, failing to 1) educate Mr. Nigon and his wife concerning DVT-PE;[14] 2) prescribe thromboprophylactic medication; and 3) treat DVT-PE as a genetic disorder) and Mr. Nigon's death. Trial Court Opinion, 3/18/22, at 3 (unnumbered). The trial court relied on Dr. Jewell's deposition testimony that he was aware of Mr. Nigon's DVT-PE history and the need for post-operative thromboprophylactic medication:

> As to the alleged failure to educate [Mr. Nigon] and his wife, the record in this case clearly establishes that Dr. Jewell and his staff met with [Mr. Nigon] and his wife prior to surgery, clearly discussed the need for anti-coagulation medication at the time of the surgery, and that such medication was in fact prescribed by Dr. Jewell following completion of the surgery[.] … [Mr. Nigon] was discharged following surgery with the prescriptions for not only [] pain medicine, but also the anti-coagulation medicine, which somehow, due to a failure and breakdown in some portion of the system, was apparently not provided to [Mr. Nigon].
>
> ….
>
> [The estate] has not produced any evidence whatsoever that there was any direct, unsevered relationship by and between any conduct of [Dr. Thomas Malvar] and the death of [Mr. Nigon]. To the contrary, the uncontroverted evidence clearly is that Dr. Jewell was aware of [Mr. Nigon's] past history of medication for the DVT-PE, and the need for anti-coagulation medicine following conclusion of the surgery.

---

[14] The term "DVT-PE" encompasses both deep vein thrombosis and pulmonary embolism.

*Id.* at 3-4 (unnumbered).[15]

In its Rule 1925(a) opinion, the trial court reiterated its determination that there was no causal connection between the Malvar Defendants' conduct and the DVT resulting in Mr. Nigon's death after surgery. Rule 1925(a) Opinion, 7/25/23, at 3 (unnumbered).

> The record in this case is clear that [Mr. Nigon] and his wife met with Dr. Jewell and his staff prior to surgery, clearly discussing the need for anti-coagulate medication following surgery, and that such medication was in fact prescribed by Dr. Jewell following completion of the surgery. It was a tragic breakdown in the entry of that information upon the medical records system of … UPMC Passavant, which caused the death of Mr. Nigon.
>
> The contact of Dr. Thomas Malvar with [Mr. Nigon] was that of a [primary] care physician clearing [Mr. Nigon] for surgery. Dr. [Thomas] Malvar had no further contact whatsoever with [Mr. Nigon], nor did Dr. [Thomas] Malvar have any authority whatsoever to intervene in the performance of the surgery … by Dr. Jewell at the UPMC Passavant Hospital.

*Id.* (unnumbered). The trial court determined that regardless of any action or inaction by Dr. Thomas Malvar, Dr. Jewell was aware of Mr. Nigon's health history and need for post-operative anticoagulation medication; hence, any negligence by Dr. Thomas Malvar was completely severed by Dr. Jewell's involvement.

---

[15] Regarding Dr. Thomas Malvar's failure to treat DVT-PE as a genetic disorder requiring lifelong medication, the trial court stated, "the record is clear that prior to surgery, [Mr. Nigon] was in good health for a [] period of time, and was not in need of the anti-coagulation medication." Trial Court Opinion, 3/18/22, at 3 (unnumbered).

After careful review, and mindful of our standard of review, we disagree with the trial court's assessment that Dr. Thomas Malvar was entitled to judgment as a matter of law. Instead, we conclude the estate raised a genuine issue of material fact concerning Dr. Thomas Malvar's liability.

The estate submitted two expert reports in support of its medical negligence claim against Dr. Thomas Malvar. Dr. Coris, the estate's family medicine expert, explained that Dr. Thomas Malvar had been Mr. Nigon's primary care provider since at least 2016. Estate's Motion for Summary Judgment on Comparative Fault, 8/24/21, Exhibit D (Expert Report of Dr. Coris), at 1. Dr. Coris stated that Dr. Thomas Malvar had ordered some blood testing when Mr. Nigon presented with the DVT in September 2017. *Id.* at 2. However, Dr. Thomas Malvar "did not obtain labs for: Prothrombin gene mutation, anti-thrombin III, MHTFR mutation, or homocysteine. **All of these are standard tests that must be ordered with new onset of [venous thromboembolism (VTE)].**" *Id.* (emphasis added). Regarding Dr. Thomas Malvar's failure to order this subset of tests, Dr. Coris stated:

> Mr. Nigon's children have been tested and are positive for the prothrombin gene mutation. Prothrombin gene mutations are the third leading cause of thrombophilia … and are present in approximately 2-4% of Caucasians. Mrs. Nigon was also tested for prothrombin gene mutations and her test results were negative. This indicates that **Mr. Nigon** would have passed on the mutation to his children and **was positive for a prothrombin gene mutation.** Inexcusably, a prothrombin gene mutation was not tested for during Mr. Nigon's evaluation for his DVT and PE. A mutation of the prothrombin gene, if properly tested for and identified, would have warranted lifetime anticoagulation to protect from future blood clots.

- 18 -

*Id.* at 3 (emphasis added). Dr. Coris opined that Dr. Thomas Malvar deviated from the standard of care during his initial treatment of Mr. Nigon's 2017 DVT-PE by:

- Failing to conduct a thorough history, failing to appropriately follow up, failing to conduct a full physical exam, and failing to document the cause of Mr. Nigon's new onset VTE;

- Failing to conduct a thorough and appropriate hematologic evaluation for thrombophilia when faced with Mr. Nigon's new onset, unprovoked VTE;

- If Dr. [Thomas] Malvar was uncomfortable handling and caring for Mr. Nigon's new onset VTE, he deviated from the appropriate standard of care by failing to consult with or refer Mr. Nigon to a hematology specialist;

- Failing to test Mr. Nigon for known and common hereditary thrombophilia diseases, including, but not limited to, a mutation of the prothrombin gene, which Mr. Nigon had—as evidenced by his family's blood results;

- Improperly conducting the limited coagulopathies that Mr. Nigon did undergo, as they were conducted during acute VTE and done while Mr. Nigon was on anticoagulation medication;

- Failing to provide and/or document any follow up care for Mr. Nigon's VTE after January of 2018; and

- Failure to provide appropriate patient education on VTE, a life-threatening condition. Dr. [Thomas] Malvar at no time had a discussion of future risk of VTE with initial evaluation and treatment, and at no time discussed the future settings of increased risk (*i.e.* surgery) that Mr. Nigon faced.

*Id.* at 4.

Dr. Coris also evaluated Dr. Thomas Malvar's treatment of Mr. Nigon during his pre-operative visit. Dr. Thomas Malvar noted "no medical issues"

surrounding Mr. Nigon's surgery, and he did not discuss with Mr. Nigon the risk of DVT-PE following orthopedic surgery with subsequent immobilization. *Id.* at 2. Dr. Coris opined that Dr. Thomas Malvar deviated from the acceptable standard of care by:

- Conducting a pre-operative evaluation that was severely devoid of content;

- Failing to do any risk assessment for VTE prior to clearing a patient for an orthopedic surgery with a known increased risk of VTE;

- Ignoring and not taking into account [Mr. Nigon's] previous medical history and risks affiliated with medical history;

- Failing to mention prior VTE while clearing [Mr. Nigon] for an orthopedic surgery with an increased risk of VTE;

- Failing to appreciate the increased risk of VTE affiliated with Mr. Nigon's orthopedic surgery;

- Failing to appreciate the increased risk of VTE Mr. Nigon faced because of his history of VTE;

- Inaccurately stating "There are no medical concerns" in clearance for orthopedic surgery;

- No discussion of peri-operative anticoagulation or increased risk of VTE with [Mr. or Mrs. Nigon];

- Failed to appropriately review Mr. Nigon's medical records and medical history—which show a history of DVT and PE—prior to clearing him for surgery; and

- Failure to coordinate with orthopedic surgeon to ensure Mr. Nigon, who clearly needed anticoagulation in conjunction with his pending orthopedic surgery, received the needed anticoagulants.

*Id.* at 4-5.

- 20 -

In sum, Dr. Coris offered the following opinion to a reasonable degree of medical certainty:

> **[I]t is my opinion that the deviations in the standard of care by Dr. [Thomas] Malvar ... directly caused Mr. Nigon's death.** Moreover, the failures of Mr. Nigon's entire medical team in conjunction with his May 9, 2019 orthopedic surgery ... directly caused Mr. Nigon's death. VTE post operatively is largely preventable with appropriate thromboprophylactic care and risk assessment. Mr. Nigon was not provided any thromboprophylaxis and was not provided any patient education on the subject. The failure to provide Mr. Nigon the appropriate thromboprophylaxis and patient education directly caused his death, and pain and suffering he endured prior to his death, on May 14, 2019. Additionally, had Dr. [Thomas] Malvar provided Mr. Nigon with a proper work up for hereditary thrombophilia upon the initial onset of VTE in 2017, Mr. Nigon would have been prescribed lifetime anticoagulation, which would have prevented his untimely death.

*Id.* at 5 (emphasis added).

Additionally, the estate submitted an expert report authored by Dr. Ludgin, a root cause analysis expert. According to Dr. Ludgin, "[n]umerous system failures" led to Mr. Nigon's discharge following surgery without a prescription for anticoagulation medication. *See* Estate's Motion for Summary Judgment on Comparative Fault, 8/24/21, Exhibit T (Expert Report by Dr. Ludgin), at 6-7. Concerning the estate's claim against Dr. Thomas Malvar, Dr. Ludgin explained that Dr. Thomas Malvar was aware of Mr. Nigon's history of DVT-PE, and knew or should have known Mr. Nigon would need anticoagulation medication following surgery. *See id.* at 7. Dr. Ludgin rendered the following opinion, to a reasonable degree of medical certainty:

> 3. Dr. [Thomas] Malvar, as the physician with direct knowledge and experience from Mr. Nigon's 2017 episode of DVT/PE, fell

- 21 -

below the accepted standard of care in his own office by possessing all the information and yet failing to incorporate the context of Mr. Nigon's health history in his pre-op clearance … and the completion and transmission of those documents[,] together with the material facts (DVT/PE and the need for post-op anticoagulation) needed to ensure safe care for Mr. Nigon. Dr. [Thomas] Malvar also failed to highlight the need for post-op anticoagulation. The communication from Dr. [Thomas] Malvar and his office of the information in its files was a miserable failure.

> a. As a direct and proximate result, communication and further emphasis of Mr. Nigon's 2017 pulmonary embolus and the need for post-op anticoagulation from the physician who [k]new (or should have known him best) was lost entirely. In addition, Dr. [Thomas] Malvar failed to communicate with Tri-State on Mr. Nigon's post-op medical needs and failed to determine which office and which physician would take responsib[ility] for managing Mr. Nigon's non-surgical problem (clotting disorder). Further, the necessary post-op care (anticoagulation) for Mr. Nigon was lost in a series of incomplete and unsafe practices … that resulted in Mr. Nigon not being discharged on Xarelto.

> b. As the clinical experts will testify, this resulted in the formation of [a] clot that traveled to Mr. Nigon's lung, blocking blood flow to both his right and left lung, the direct consequence of which was his untimely death.

*Id.* at 10.[16] Ultimately, Dr. Ludgin concluded "the multitude of system failures" leading to Mr. Nigon's death "are **attributable to each of the defendants and to the defendants as a whole**." *Id.* (emphasis added);

---

[16] Dr. Ludgin also references the alleged alteration to Mr. Nigon's medical record made by Dr. Thomas Malvar following Mr. Nigon's death. *See* Estate's Motion for Summary Judgment on Comparative Fault, 8/24/21, Exhibit D (Expert Report by Dr. Coris), at 11. Dr. Ludgin describes these changes as "a poorly executed but definite attempt at a 'cover-up' to mislead and obfuscate…. It likewise smacks as a conscious admission that Dr. [Thomas] Malvar provided sub-standard pre-op clearance services." *Id. But see id.* (Dr. Ludgin noting he "did not review the audit trail [or] chronic[le] the entirety of [the] changes that were made….").

*see also id.* (stating each defendant is responsible for the circumstances leading to Mr. Nigon's death).

After careful review, we conclude the record, viewed in the light most favorable to the estate, does not support the grant of summary judgment in Dr. Thomas Malvar's favor. *See Bourgeois*, 242 A.3d at 650. We reiterate that this standard applies to expert reports, where the expert's conclusions are supported by the record. *See id.* Moreover, "while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact…." *Summers*, 997 A.2d at 1161.

In their respective reports, the experts set forth the materials of record they reviewed in reaching their conclusions. *See* Estate's Motion for Summary Judgment on Comparative Fault, 8/24/21, Exhibit D (Expert Report of Dr. Coris), at 1 (identifying all written discovery, including Mr. Nigon's medical records; deposition transcripts; other expert reports; and blood test results from Mr. Nigon's family members); Exhibit T (Expert Report of Dr. Ludgin), at 2-3 (listing all materials reviewed). Thus, contrary to the trial court's summary conclusion, it is clear Dr. Coris and Dr. Ludgin reviewed the facts of record before rendering their expert opinions.

Read in their entirety, the estate's expert reports raised a genuine issue of material fact by attributing Mr. Nigon's DVT/PE and resulting death either

in whole or in part to Dr. Thomas Malvar. Whether Dr. Thomas Malvar's alleged breach of the standard of care was a proximate cause of Mr. Nigon's death was a disputed issue that should have been reserved for a jury. *See Summers*, 997 A.2d at 1161-62 (where exposure to asbestos was not disputed and medical records established pleural thickening, holding the question of whether pleural thickening proximately caused the appellants' symptoms should have gone to the jury). Therefore, the trial court erred by granting summary judgment.

In its second issue, the estate argues the trial court erred by disregarding agency law and dismissing Dr. Maritoni Malvar from the case. Estate's Brief at 44. The estate avers Dr. Maritoni Malvar and Dr. Thomas Malvar are jointly and severally liable as general partners of Malvar & Associates. *Id.* at 46. The estate additionally voices its concerns regarding the trial court's "unexplainable reversal in its application of long-standing partnership law on summary judgment." *Id.*

The Malvar Defendants counter the record is devoid of any allegation that Dr. Maritoni Malvar supervised Dr. Thomas Malvar or was in any way involved with Mr. Nigon's treatment. Appellees' Brief at 12-13.

We begin with a brief review of the trial court's consideration of Dr. Maritoni Malvar's affidavits of non-involvement and motions to dismiss at the preliminary objection and summary judgment stages of this litigation. Following argument on the parties' preliminary objections, the trial court

overruled Dr. Maritoni Malvar's preliminary objection in the nature of a demurrer and denied her related motion to dismiss. **See** Trial Court Opinion, 3/5/20, at 11-14. In doing so, the trial court relied on various sections of Pennsylvania's Uniform Partnership Act,[17] and stated as follows:

> Simply put, though the lines between a general partnership and its members may be blurred at times …, they are clear for purposes of vicarious liability in Pennsylvania: the entities are one and the same, and an action proceeding on this legal theory against a general partnership may and should be done in conjunction with an identical cause of action against each member thereof.

**Id.** at 13. The trial court concluded that Dr. Thomas Malvar acted within the scope of the partnership; therefore, the estate properly joined Malvar & Associates and Dr. Maritoni Malvar, as a general partner, in the action. **Id.** at 13-14.

Later, following discovery, Dr. Maritoni Malvar filed a motion for summary judgment, citing her affidavit of non-involvement, and arguing she

---

[17] Section 8435(a) provides:

> A partnership is liable for loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with the actual or apparent authority of the partnership.

15 Pa.C.S.A. § 8435(a). Notwithstanding certain exceptions not relevant to this case, "all partners are jointly and severally liable for all … liabilities of the partnership…." **Id.** § 8436(a). Further, under Section 8437(b), "a partner may be joined in an action against the partnership or named in a separate action." **Id.** § 8437(b).

could not be held liable for Dr. Thomas Malvar's conduct, because she had no supervisory authority over him.[18] To support her position, Dr. Maritoni Malvar relied on *Strain v. Ferroni*, 592 A.2d 698 (Pa. Super. 1991), which states the following:

> Physicians and surgeons, like other persons, are subject to the law of agency and a physician may be at the same time the agent both of another physician and of a hospital even though the employment is not joint. … In determining whether a person is a servant of another[,] it is necessary that he not only be subject to the latter's control or right of control with regard to the work to be done and the manner of performing it[,] but that this work is to be performed on the business of the master or for her benefit. … Actual control, of course, is not essential. It is the right to control which is determinative. On the other hand, the right to supervise, even as to the work and the manner of performance, is not sufficient; otherwise[,] a supervisory employee would be liable for the negligent act of another employee though he would not be the superior or master of that employee in the sense the law means it. …

*Strain*, 592 A.2d at 704 (citation omitted); *see also* Dr. Maritoni Malvar's Motion for Summary Judgment, 8/17/21, ¶ 14.

Instantly, following argument on the motions for summary judgment, the trial court changed course and "rejected the [estate's] attempt to impose general partnership law on the specific field of physicians and surgeons…." Trial Court Opinion, 11/3/21, at 32. The court, evidently persuaded by Dr.

---

[18] In her motion for summary judgment, Dr. Maritoni Malvar conceded a claim for vicarious liability could be raised against Malvar & Associates as the partnership group. *See* Dr. Maritoni Malvar's Motion for Summary Judgment, 8/17/21, ¶ 22.

Maritoni Malvar's reliance on ***Strain***, emphasized the right of control over another's actions must be the "absolute factor." ***Id.*** at 32-33.

After careful review, we conclude the trial court erred by dismissing Dr. Maritoni Malvar from the action. Preliminarily, any reliance on ***Strain*** is misplaced. In ***Strain***, the plaintiffs (husband and wife) filed a medical negligence claim against two physicians, Dr. Ferroni and Dr. Harrer, following wife's miscarriage. Dr. Ferroni was wife's obstetrician-gynecologist. ***Strain***, 592 A.2d at 352. When wife was in her fourth month of pregnancy, she suffered severe pain and cramping. ***Id.*** Because Dr. Ferroni was unavailable, Dr. Harrer answered wife's phone call and provided medical advice before wife proceeded to the hospital for treatment. ***Id.*** at 352-53. Pertinent to the instant case, plaintiffs argued Dr. Harrer was an **agent** of Dr. Ferroni and sought to hold Dr. Ferroni liable for Dr. Harrer's alleged negligence. ***Id.*** at 353.

This Court evaluated the claim based on **agency principles**, as set forth above. ***See id.*** at 704. This Court concluded "the nature of the professional relationship shared by Drs. Ferroni and Harrer is not the type of arrangement contemplated by cases which deal with principal-agency law." ***Id.*** at 705; ***see also id.*** at 704-05 (considering the extent of the physicians' professional relationship and whether Dr. Ferroni could be considered an "employer" or "supervisor" of Dr. Harrer, or whether he otherwise exercised control over Dr. Harrer).

Our review reveals **Strain** is distinguishable from the instant case. Significantly, the estate seeks to hold Dr. Maritoni Malvar liable as a general partner of Malvar & Associates, rather than as a principal with liability for an agent (as in **Strain**). Dr. Maritoni Malvar correctly states the estate did not establish she employs, supervises, or exerts any control over Dr. Thomas Malvar's performance as a medical provider. However, because Drs. Maritoni and Thomas Malvar are members of a partnership, the principal-agent framework applied by the **Strain** Court is not at issue.

This Court previously has addressed medical malpractice claims levied against more than one physician, where each physician is named individually and as a partner in a professional partnership. *See Keech v. Mead Johnson & Co.*, 580 A.2d 1374 (Pa. Super. 1990) (addressing physician's dismissal from medical malpractice suit in her individual capacity, though she remained in litigation as a partner); *see also Grubb v. Albert Einstein Med. Ctr.*, 387 A.2d 480 (Pa. Super. 1978) (*en banc*) (concluding physician could be held liable for a tort committed by a partner physician acting within the ordinary scope of their partnership). Because the trial court declined to consider partnership law in granting Dr. Maritoni Malvar's motion for summary judgment, we need not undertake a lengthy discussion of the facts of **Keech** and **Grubb**. However, these cases illustrate that general partnership law can, in fact, be applied to physicians. Thus, the trial court erred by concluding that

partnerships involving physicians must be categorically excluded from application of partnership law.

The estate averred that Malvar & Associates is a medical practice operating as a partnership. Dr. Maritoni Malvar does not dispute her status as a general partner in the practice. Accordingly, the estate's allegations, viewed in a light most favorable to it as the non-moving party, were sufficient to survive summary judgment.[19] **See generally Grubb**, 387 A.2d at 488 (concluding there was sufficient evidence to allow a jury to assign liability against both physicians in a partnership). We therefore reverse the trial court's order in this regard as well.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/9/2024

---

[19] Importantly, we do not determine whether Dr. Maritoni Malvar is, in fact, liable as a partner of Malvar & Associates. Rather, we conclude the trial court erroneously dismissed Dr. Maritoni Malvar from litigation, thereby removing the question of her liability from the jury. It is exclusively for the jury to determine how liability, if any, should be apportioned among the various defendants.