J-S11001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JOHN L. TWYMAN, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANNE WIEDEMANN M.D., FAMILY | : | No. 1063 EDA 2023 |
| PRACTICE OF WILLOW GROVE, | : | |
| ABINGTON MEMORIAL HOSPITAL, | : | |
| ANTHONY WYDAN, M.D., JENNIFER | : | |
| ORR, M.D., THOMAS JEFFERSON | : | |
| UNIVERSITY HOSPITAL | : | |

Appeal from the Order Entered June 26, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2018-16338

BEFORE: BOWES, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.: **FILED OCTOBER 8, 2024**

John L. Twyman appeals *pro se* from the order entered June 26, 2023, denying his motion to remove the entry of compulsory nonsuit as to his medical malpractice claims against Anne Wiedemann, M.D.,[1] Family Practice of Willow Grove ("Willow Grove"), and Abington Memorial Hospital (collectively, "Appellees"). We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] After the complaint was filed naming Dr. Wiedemann as a defendant, she married and now uses the last name Tenthoff. For convenience, we will refer to her as Dr. Tenthoff throughout the remainder of this writing.

This case arises from Appellant's allegations that Dr. Tenthoff failed to properly diagnose him with pernicious anemia.[2] Abington Memorial Hospital, which does business as Willow Grove, is a family medical practice operating under the umbrella of Thomas Jefferson University Hospital. Appellant first saw Dr. Tenthoff during a sick visit in 2007, when she substituted for another doctor who was unavailable. From that point, Appellant continued to see Dr. Tenthoff as his primary care physician throughout the years, predominantly for issues relating to his high blood pressure.

On December 5, 2014, Appellant presented with complaints of ear wax buildup and itching arising from an allergic reaction. Dr. Tenthoff prescribed him an oral steroid, recommended that he obtain an over-the-counter medicine to address the ear wax, and refilled his blood pressure medication. Approximately a week later, Appellant faxed to the practice a report containing laboratory results of blood work that had been performed as part of his employment ("LabCorp Report"). According to Dr. Tenthoff, the LabCorp Report showed that Appellant's red blood count and mean corpuscular volume levels were slightly abnormal. However, she had no specific concerns because his hemoglobin levels were normal and because he had never expressed

---

[2] According to Cleveland Clinic: "Pernicious anemia, one of the causes of vitamin B12 deficiency, is an autoimmune condition that prevents your body from absorbing vitamin B12. Left untreated, pernicious anemia can cause serious medical issues, including irreversible damage to your nervous system." Cleveland Clinic, *Pernicious Anemia*, https://my.clevelandclinic.org/health/diseases/22377-pernicious-anemia (last visited Jul. 17, 2024).

having symptoms associated with something like pernicious anemia, such as numbness, tingling, confusion, weakness, or problems with walking or balance. Accordingly, Dr. Tenthoff made no follow up on the LabCorp Report, and Appellant requested none. Over the next several years, Appellant maintained his regular visits with the practice and Dr. Tenthoff.

On February 2, 2017, Appellant saw Dr. Tenthoff for indigestion, increased urinary frequency, and nocturia, which is excessive urinating overnight. The doctor diagnosed him as having either gastro esophageal disease ("GERD") or benign prosatic hyperplasia. Accordingly, she prescribed omeprazole and requested that he contact the office the following week if his symptoms did not abate. Appellant called the practice approximately five days later, relaying that he was still suffering symptoms. Dr. Tenthoff consequently instructed him to increase the daily dose of the omeprazole.

Dr. Tenthoff next spoke with Appellant on the phone on March 2, 2017, when he informed her that his condition had not improved. Dr. Tenthoff referred him to a gastrointestinal specialist. Appellant did not see any specialist pursuant to the doctor's advice, though he did visit an urgent care facility called Patient First Urgent Care.

On March 9, 2017, while Dr. Tenthoff was out of town, Appellant called Willow Grove and spoke with a receptionist. The trial court summarized the following events thusly:

> [Appellant] requested that he be placed on the medication pantoprazole because the originally prescribed omeprazole was not helping. . . . No further symptoms were communicated to

the practice besides throat discomfort. Dr. Tenthoff requested that one of the medical assistants in her office contact [Appellant] to clarify which medication he was requesting[, since pantoprazole and omeprazole were simply different brands of the same generic drug]. Later that evening, [Appellant] contacted Dr. Anthony Wydan, the on-call physician. [Appellant] was angry that pantoprazole had not been called into the pharmacy for him after he had requested it. Dr. Tenthoff was unaware that [Appellant] had already received a prescription for pantoprazole from Patient First Urgent Care . . .

On [the following] morning of March 10, 2017, [Appellant] called the practice and began yelling at staff. He told staff he had lost weight, indicated that he would be requesting his medical records, and said "I will show her what the pain is of having someone try to kill you." [Appellant] "said that if he did not receive a phone call from Dr. Tenthoff by 5:00 p.m. with an apology, there were consequences to be had." Dr. Tenthoff took [Appellant]'s words as a direct threat. [She] determined that the office needed to start the process "to get him removed to make sure we were all safe."

. . . .

Dr. Tenthoff testified that during [Appellant's] treatment with her in 2017, [Appellant] had no symptoms that would have required her to check a complete blood count [test ("CBC")] of [vitamin] B12 levels.

Trial Court Opinion, 6/1/23, at 4-5 (cleaned up).

Within several days of these phone calls, Appellant obtained a blood test through Patient First Urgent Care, which revealed that he was severely dehydrated and required emergency treatment. He immediately went to Doylestown Hospital based on that and other related problems, including malnourishment, weight loss, the inability to swallow, confusion, and slurred speech. Doctors at the hospital diagnosed Appellant with, *inter alia*, pernicious anemia. After receiving treatment, his condition gradually improved.

Appellant filed a *pro se* complaint against the Appellees and several other defendants, which, as amended a third time, raised one count each of professional negligence, intentional infliction of emotional distress ("IIED"), and vicarious liability. Within the complaint, Appellant alleged that from the time he sought help from Dr. Tenthoff in early February 2017 until his diagnosis in March, he suffered from bouts of psychosis and hallucinations, and was "also suffering from severe malnutrition, fatigue, sleeplessness[,] and hopelessness." Third Amended Complaint, 10/26/28, at ¶ 14. Appellant also sought punitive damages in conjunction with the IIED claim. Prior to trial, the parties stipulated to discontinue any actions against any defendants besides Appellees.

The case proceeded to a jury trial wherein Appellant represented himself. Appellant called Dr. Tenthoff as if on cross, who testified consistently with the above background. Appellant testified on his own behalf. Critically, he also called Mark Levin, M.D. as an expert witness. As will be discussed in more detail *infra*, Dr. Levin's testimony generally bore out that Appellant had likely suffered from pernicious anemia for several years prior to 2017 and that, had Willow Grove done a CBC test in December 2014 after receiving the LabCorp Report, Appellant would have been diagnosed sooner and treated before his condition became dire.

Appellant also introduced testimony from Arlene Stillwater, Psy.D., a clinical psychologist. Among other things, she relayed that Appellant began treating with her in 2021 for post-traumatic stress disorder ("PTSD"),

- 5 -

depression, and anxiety, which Appellant claimed arose from his near-death experience before going to Doylestown Hospital.

At the conclusion of Appellant's case-in-chief, Appellees moved for compulsory nonsuit, contending that Appellant had not met his burden of proof as to any of his claims. The trial court, which had access to the transcripts containing Dr. Levin's testimony prior to the close of Appellant's case, granted the motion. Specifically, the court placed the following on the record at trial:

> With respect to the claims for [IIED], the [c]ourt rules that there is insufficient evidence to support those causes of action, so the nonsuit with respect to those will be granted.
>
> . . . .
>
> As I said, I have Dr. Levin's transcribed notes. And after careful review of the transcribed notes of testimony, of Dr. Levin's testimony, the court find[s] the following:
>
>> Plaintiff failed to produce an expert, medical testimony at trial regarding the standard of care applicable to Dr. Tenthoff during her treatment of [Appellant];
>>
>> That the plaintiff did not produce an expert medical testimony at trial which qualified Dr. Levin to express expert medical opinion regarding the standard of care or a standard of care violation by a family physician pursuant to Section 1303.512(c) of the [Medical Care Availability and Reduction of Error Act.]
>>
>> And the plaintiff failed to produce expert medical testimony at trial which was held to a reasonable degree of medical certainty.
>>
>> Those magic words don't need necessarily to be expressed, according to case law, but the court has to be satisfied, in looking at the entirety of an expert's testimony, that the

> expert has the requisite degree of certainty that is equivalent to a reasonable degree of medical certainty.
>
> Here the plaintiff failed to produce medical testimony at trial which was held to a reasonable degree of medical certainty or language equivalent to that, that Dr. Tenthoff violated the standard of care, risk of harm, or was a proximate cause or probable cause of any harm to him.

N.T. Trial, 1/6/23, at 173-75 (some capitalization altered)

Since the court found that Dr. Tenthoff was not liable for either malpractice or IIED, Appellant's count for vicarious liability and request for punitive damages were likewise dismissed. Appellant timely filed a post-trial motion requesting removal of the nonsuit and a new trial. The court denied the motion and this *pro se* appeal followed.[3] Appellant was ordered to file a statement of errors pursuant to Pa.R.A.P. 1925(b), and he did so. The court thereafter issued a responsive opinion.

Appellant presents three issues for our consideration, which we have reordered for ease of disposition:

I.    Did the court abuse its discretion when granting the Appellees' January 6, 2023 motion for compulsory nonsuit when

_____

[3] At the time Appellant filed his notice of appeal, there was no entry of judgment on the docket. We have stated that "in a case where nonsuit was entered, the appeal properly lies from the judgment entered after denial of a motion to remove nonsuit." **Billig v. Skvarla**, 853 A.2d 1042, 1048 (Pa.Super. 2004). Accordingly, we remanded the case and directed Appellant to praecipe the trial court Prothonotary to enter final judgment on the verdict and to file with this Court a certified copy of the trial court docket reflecting the entry of judgment within fourteen days. Appellant complied, and we therefore treat this appeal as timely. **See** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").

Appellant's medical expert provided standard of care, liability, and causation testimony at trial?

II.     Did the trial court abuse its discretion by not providing relief under Pa.R.C.P. 227.1 by not removing its January 9, 2023 compulsory [nonsuit] as Appellant met a *prima facie* case for medical malpractice?

III.    Did the trial court abuse its discretion by dismissing Appellant's claims for [IIED] and punitive damages at the close of Appellant's case in chief?

Appellant's brief at 6 (cleaned up).

We review these claims under the following standard:

A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief. Absent such finding, the trial court shall deny the application for a nonsuit. On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [the appellant's] favor." The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial.

The appellate court must review the evidence to determine whether the trial court abused its discretion or made an error of law.

*Baird v. Smiley*, 169 A.3d 120, 124 (Pa.Super. 2017) (internal citations omitted).

Appellant's first two issues concern the trial court's refusal to remove the compulsory nonsuit as to the medical malpractice count. This Court has stated that "[m]edical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient." *Nigon v. Jewell*, 313 A.3d 1124, 1133 (Pa.Super. 2024)

(citation omitted). To prove this action, a plaintiff must demonstrate the following elements:

a duty owed by the physician, that the breach was the proximate cause of the harm suffered, and the damages were a direct result of harm. With all but the most self-evident medical malpractice actions, there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation.

*Id*. Further, as to causation, "the plaintiff must show that the defendant physician's failure to exercise the proper standard of care caused the plaintiff's injury. Generally, a plaintiff in a medical negligence action must present expert testimony to establish the physician's deviation from the standard of care proximately caused the plaintiff's injury." *Id*.

In its 1925(a) opinion, the trial court offered a thorough analysis as to why it did not err in granting a compulsory nonsuit regarding Appellant's professional negligence claim. First, it summarized Dr. Levin's testimony as such:

Dr. Levin testified that he reviewed the [LabCorp Report] of December 14, 2014, and noted that "the white [blood] count was decreased, the platelet count was decreased[,] and the red blood count was decreased. And the MCV . . . was decreased." He testified that these levels could be pre-markers for pernicious anemia as well as other serious conditions. Dr. Levin also testified that in 2004, [Appellant] was put on [vitamin] B12 injections but only took them for a month. Upon examination of the March 11, 2017 Doylestown Hospital record, Dr. Levin acknowledged that [Appellant] was diagnosed with a B12 deficiency, pernicious anemia, GERD, pancytopenia, and gastritis. Dr. Levin testified that "pernicious anemia in my opinion based on everything I reviewed, has been in place for years." Dr. Levin further testified that had any testing been done at the time of the December 2014 report was reviewed by Dr. Tenthoff, the diagnosis of pernicious

anemia or vitamin B12 deficiency could have been made. He testified that "doing a CBC. . . and B12 level would have given you the diagnosis. Another thing that could have been done is to have the lab do a blood smear which would have also confirmed a B12 deficiency."

. . . .

Significantly, . . . **Dr. Levin never offered his expert opinion within a reasonable degree of medical certainty regarding the standard of care in this case, whether [Appellees] deviated from that standard of care and whether any violation in the standard of care either increased the risk of harm or was a factual cause of harm to [Appellant].**

Trial Court Opinion, 6/1/23, at 9-10 (cleaned up, emphasis added).

After reviewing Dr. Levin's testimony, the trial court concluded that it properly granted nonsuit against Appellant on his malpractice claim because Appellant failed to meet his burden of establishing a *prima facie* case for professional negligence. *Id*. at 15. Specifically, it found that "Dr. Levin never testified that Dr. Tenthoff's conduct fell below the standard of care for a family physician or for any other physician." *Id*. at 16. Rather, the court determined that the doctor's testimony only established that "[Appellant] had pernicious anemia while under Dr. Tenthoff's care. Dr. Levin never testified that the standard of care was violated by failing to diagnose and treat that condition or that said deviation increased the risk of harm or was [the] factual cause of any harm." *Id*. at 19.

Appellant vigorously disputes this finding in his principal brief, which is over 100 pages in length and which he readily admits exceeds the word limit

provided by Pa.R.A.P. 2135(a)(1).[4]  He asserts that Dr. Levin "provided testimony as to the standard of care as to the diagnosis and treatment of pernicious anemia to a reasonable degree of medical certainty."[5]  Appellant's brief at 34 (some capitalization altered).  *Id*. at 36-37.  Appellant further states that the court erred because Dr. Levin established harm, opining that "Appellant was suffering prolonged, untreated pernicious anemia during the medical occurrence at issue as confirmed by the medical records from Doylestown Hospital between March 11, 2017 and March 12, 2017."  *Id*. at 41.

Furthermore, Appellant highlights that there was testimony that Dr. Tenthoff was the cause of his harm, arguing that "[b]ased on the evidence in Appellant's case-in-chief, a reasonable jury could have **easily** concluded Appellees' failure to properly diagnose, treat, and manage Appellant's

---

[4] "The certification requirement is not limited to counsel:  *Pro se* litigants, too, are obliged to provide a certification for a primary brief that exceeds thirty pages."  **In re deLevie**, 204 A.3d 505, 510-11 (Pa.Super. 2019).  While we could sanction Appellant for violating this rule, we decline to do so in this instance since his defective brief has not hampered our review.

[5] In so doing, Appellant relies upon promulgated guidelines for the treatment of pernicious anemia from the National Heart, Lung and Blood Institute website, without citation to where in the record this document was entered into evidence.  Similarly, in his reply brief, Appellant cites to and discusses a 2020 medical training manual that was not introduced at trial.  **See** Appellant's reply brief at 21.  We may not consider these materials.  **See Commonwealth v. Branthafer**, 315 A.3d 113, 118 n.1 (Pa.Super. 2024) (stating that "under the Pennsylvania Rules of Appellate Procedure, any document which is not part of the officially certified record is deemed non-existent - a deficiency which cannot be remedied merely by including copies of the missing documents in a brief or in the reproduced record").

pernicious anemia was not only reckless, but the proximate cause of his harm, injuries, and severe emotional distress." *Id*. at 46 (emphasis in original); *see also id*. at 47 (discussing *Carrozza v. Greenbaum*, 866 A.2d 369 (Pa.Super. 2004)). He additionally contends, **without citation to the record**, that "Dr. Levin testified that Dr. Tenthoff should have acted on the [LabCorp Report] outlining abnormal and elevated blood cell counts and levels," and further that "the acceptable standard of care was to order a [CBC] . . . to determine the existence of pernicious anemia." *Id*. at 48.

Upon review, we find that the trial court did not err in granting compulsory nonsuit against Appellant regarding the count for medical malpractice. Our close examination of Dr. Levin's testimony confirms the conclusion that he failed to identify a standard of care to the jury, allege that Dr. Tenthoff deviated from that standard of care, or opine that any such deviation caused Appellant's injuries. The substantial bulk of Appellant's brief and reply brief is dedicated to pointing out the extensive testimony and evidence showing that (1) Appellant had pernicious anemia for years before it was diagnosed, and (2) it could have been diagnosed in December 2014 had additional testing been done by Dr. Tenthoff. Appellant takes great pains to reiterate these points numerous times throughout his filings in this Court. However, even assuming that this is true, that still falls short as a matter of law of meeting Appellant's burden to establish professional negligence.

Dr. Levin did not testify, for example, that the standard of care for a family practice would be to conduct a CBC test upon receiving lab results from

- 12 -

a patient when hemoglobin levels were within normal limits. He likewise did not attest to a reasonable degree of medical certainty that such testing would be expected to be performed when the patient did not complain of any symptoms associated with pernicious anemia or vitamin B12 deficiency, including confusion, instability, weakness, or numbness. Without expert testimony as to the appropriate standard of care and any deviation therefrom, the jury simply had no basis in which to find in Appellant's favor for malpractice against Dr. Tenthoff. *See Nigon*, 313 A.3d at 1133. This is true regardless of the fact that Appellant appears to believe that the jury could simply **infer** testimony of a standard of care and any deviation therefrom through Dr. Levin's testimony.[6]

Since the vicarious liability count against Willow Grove and Abington Memorial Hospital relied upon a finding of professional negligence as to Dr. Tenthoff, they necessarily failed when the court dismissed the professional negligence action. Therefore, no relief is due.

---

[6] **See** Appellant's brief at 54 ("The acceptable standard of care for Dr. Tenthoff on December 18, 2014, or soon thereafter would have been to further evaluate the results for pernicious anemia or a Vitamin B-12 deficiency, and not simply closing the file and advising Appellant that he was fine."); **see also** Appellant's reply brief at 19 ("Dr. Levin's expert testimony was clear and concise that, upon reviewing the [LapCorp Report] and the low red blood cell count (RBC) and elevated mean corpuscular volume (MCV) level, Dr. Tenthoff **should have known** to order or perform a CBC to determine if Appellant was suffering from low Vitamin B-12 or pernicious anemia." (emphasis in original)). As indicated, these conclusions were never provided by Dr. Levin, and instead are simply Appellant's individualized notion of what he believed Dr. Tenthoff should have done as his physician.

Appellant's remaining claim maintains that the court improperly dismissed the count for IIED and Appellant's corresponding request for punitive damages. "The four elements [a p]laintiff must show to establish [IIED] are: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Jordan v. Pennsylvania State University*, 276 A.3d 751, 775 (Pa.Super. 2022) (citation omitted). It is the responsibility of the court to determine, "as a matter of law, whether there is sufficient evidence for reasonable persons to find extreme or outrageous conduct." *Id*. "The conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. Our High Court has recounted that concerning outrageousness, "it has not been enough that the defendant has acted with intent which is tortious or even criminal . . . or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Toney v. Chester County Hosp.*, 961 A.2d 192, 202 (Pa. 2008) (citations omitted).

The trial court concluded that Appellant presented no evidence at trial that any action or inaction by Dr. Tenthoff rose to the level of being "extreme and outrageous." *See* Trial Court Opinion, 6/1/23, at 20-22. In his brief, Appellant focuses much of his discussion on the extent of the emotional distress he suffered as a result of his pernicious anemia. *See*, *e.g.*,

Appellant's brief at 63 (discussing Dr. Stillwater's testimony and that as an expert, she "satisfied the requirements for a cause of action and proximate cause for his severe emotional distress and PTSD linking both, and Appellant's on-going outpatient mental health treatment, to the harm and injuries suffered between February 2, 2017 and March 17, 2017 and its aftermath"). As to the severity of Dr. Tenthoff's conduct, the thrust of Appellant's claim is that she acted recklessly by abandoning him as a patient when he was suffering from serious medical issues, as well as by purportedly modifying hospital records.[7]

Based on our review, we agree with the trial court that, as a matter of law, the jury could not find that the evidence presented by Appellant was sufficient to satisfy this claim. Specifically, none of the testimony against Dr. Tenthoff would have permitted a juror to conclude that she acted outrageously, as required to prove IIED. *See*, *e.g.*, *Jordan*, 276 A.3d at 775 (concluding that the plaintiff's assertion that the defendants failed to correctly diagnose an infection in the knee after a CT scan did not constitute "extreme and outrageous conduct"). Moreover, despite Appellant classifying Dr. Tenthoff's actions as "reckless" on several occasions in his briefs to this Court, this is insufficient, since recklessness goes to the state of mind of the actor in

_____

[7] Appellant also asserts that some of the conduct of counsel for Appellees was egregious during the pendency of litigation, such as withholding certain discovery. *See* Appellant's brief at 81-84. However, this has no bearing as to whether Dr. Tenthoff engaged in "extreme or outrageous" conduct during the period alleged in Appellant's third amended complaint.

causing harm and is a separate inquiry from whether the conduct itself was extreme or outrageous. *See John v. Philadelphia Pizza Team, Inc.*, 209 A.3d 380, 384 (Pa.Super. 2019) ("Pennsylvania law imposes liability on one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress" (citation omitted)). Finally, assuming that Appellant's assertion that Dr. Tenthoff inappropriately altered records in March 2017 is true, he has not established how those acts were the cause of his severe emotional distress, as opposed to the purported failure to diagnose and treat his pernicious anemia. In short, he simply did not set forth sufficient evidence for the jury to find in his favor with respect to IIED, and therefore is not entitled to punitive damages. *See DiGregorio v. Keystone Health Plan East*, 840 A.2d 361, 371 (Pa.Super. 2003) ("It is settled law that one cannot recover punitive damages independently from an underlying cause of action.").

Based on the above, the trial court did not err in entering a compulsory nonsuit against Appellant as to all the counts set forth in his third amended complaint. We therefore have no cause to disturb the order denying his request to remove the nonsuit.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/8/2024